CONTINENTAL CASUALTY COMPA-
NY, Inc., et al., Appellants,

v.

ALLSOP LUMBER COMPANY, Inc.,
et al., Appellees.

ALLSOP LUMBER COMPANY, Inc.,
et al., Appellants,

v.

CONTINENTAL CASUALTY COMPA-
NY, Inc., et al., Appellees.

Nos. 17528, 17530.

United States Court of Appeals
Eighth Circuit.

Aug. 26, 1964.

Rehearing Denied Sept. 22, 1964.

John A. Biersmith, Kansas City, Mo., for Continental Casualty Co., etc., et al.

Frank J. Gaffney, of Thorp, Reed & Armstrong, Pittsburgh, Pa., Arthur Cohn, of Cohn & Lentz, Waynesville, Mo., for Allsop Lumber Co., et al.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Allsop Lumber Company, Inc., instituted this action against D & L Construction Company & Associates, a joint venture, against those comprising the venture, and against Continental Casualty Company, Inc., the venture's payment bond surety, to recover $93,088.84. This amount was claimed to be the balance due Allsop on approximately $1,000,000 of lumber furnished for use in two housing projects constructed at Fort Leonard Wood, Missouri, under the Capehart Housing Act, now part of the National Housing Act, 42 U.S.C. §§ 1594–1594j, and 12 U.S.C. §§ 1748–1748g. The answer asserted several defenses and was accompanied by a counterclaim for $47,-783.37.

The case was tried to the court. Judge Duncan, in an unreported memorandum, decided some issues for the plaintiff and others for the defendants. He entered judgment in favor of Allsop in the net amount of $81,488.28. Both sides have appealed.

In August 1959 D & L, as the prime contractor, entered into two separate con-

tracts[1] with the United States, through the Department of the Army, and the respective mortgagor-builders for the construction of about 700 units of military housing at the Fort. The joint venture participants, as principal, and Continental, as surety, executed a dual obligee payment bond to accompany each contract. Each bond was for several million dollars, was on a form administratively approved, was conditioned upon prompt payment "to all claimants * * * for all labor and materials furnished in the prosecution of the work", and authorized direct action against the surety subject to stated conditions which, so far as pertinent here, are set forth in the margin.[2] On January 27, 1960, D & L, as contractor, and Allsop, as subcontractor, signed an agreement whereby Allsop undertook to furnish D & L with the lumber required in the construction of the housing. From the relationships so created the present lawsuit emerges.

The defendants on their appeal assert that the district court erred when it concluded (a) that it had jurisdiction of the subject matter under 28 U.S.C. § 1352; (b) that it had jurisdiction of the persons of those defendants who were served outside Missouri; (c) that the notice provisions of the bonds had been satisfied; (d) that Allsop was not required to show either the actual incorporation of its lumber into the project or the reasonable value of that lumber; (e) that the parties had agreed that the price of shakes was erroneously stated in the subcontract but was appropriately corrected; and (f) that the defendants were not entitled to recover the cost of handling and disposing of truss material. Allsop on its appeal asserts that the district court erred (g) in allowing the defendants the cost of backpriming siding material and (h) in failing to allow Allsop prejudgment interest.

1. Jurisdiction of the subject matter. In its amended complaint Allsop claimed federal court jurisdiction both under the Miller Act, 40 U.S.C. §§ 270a and 270b, and under the bond statute, 28 U.S.C. § 1352. The latter reads, "The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States". Diversity facts, while apparently existent, were not fully alleged by Allsop and no attempt was made to complete them by further amendment of the complaint.

Judge Duncan held that, so far as subject matter jurisdiction was concerned, the Miller Act was not applicable to Capehart construction, but that his court had such jurisdiction under § 1352 because

---

1. Apparently the separateness of the contracts and of the supporting bonds was for the facilitation of the financing. There is nothing in the record which indicates that this is of significance on the appeals here.

2. "2. The above named Principal and Surety hereby jointly and severally agree * * * that every claimant * * * who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's * * * materials were furnished by such claimant or before the expiration of the period provided by the law of the place where the project is located for the giving of first notice of a lien of the category claimed by defendant, whichever period be longer, may sue on this bond * * *.

     *     *     *     *     *

"4. No suit or action shall be commenced hereunder by any claimant.

"(a) Unless claimant shall have given written notice to any two of the following: The Principal, any one of the Obligees or the Surety above named, before the expiration of the period referred to in condition 2 above, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail, * * * or served in any manner in which legal process may be served in the place in which the aforesaid project is located, save that such service need not be made by a public officer. For the purpose of this condition 4(a), either the giving of notice, or the filing of lien, in accordance with the pertinent lien law of the place where the project is located is a sufficient notice hereunder."

"A bond executed pursuant to the requirements of the Capehart Act is clearly a bond required by the laws of the United States".

The defense argument is that the federal district court is one of expressly defined jurisdiction; that this is to be strictly construed; that the only bond provision of the Capehart Act is that added in 1956, 70 Stat. 1110, to 42 U.S.C. § 1594(a), requiring that a Capehart contract "provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense"; that the command of the statute is directed to the administrator; and that the bonds were executed, not to satisfy the law, but to satisfy the contract. The defense further argues that all pre-Capehart cases were handled as any other routine case and depended upon diversity or the existence of a federal question for federal court jurisdiction; that if a statute requires only the giving of a bond and does not substantially affect the nature of the cause, federal jurisdiction is lacking; that the Miller Act provides another and different basis for federal court jurisdiction because it requires that the action be brought in the name of the United States; that § 1352 is to be tested by its intended purpose; that as so tested it can have no application to an action by a private party on a private bond; and that, therefore, no federal question is presented here.

This defense argument may have some appeal but at this date it does not persuade us. After all, the Capehart Act is concerned with a government need, that is, "the construction of urgently needed housing on lands owned or leased by the United States and situated on or near a military reservation or installation for the purpose of providing suitable living accommodations for military personnel". 42 U.S.C. § 1594(a). It further provides that each housing unit, when available for occupancy, shall be placed under the control of the Secretary and shall be "deemed to be housing facilities under the jurisdiction of the military department to which they are assigned"; that, with a stated exception, the stock of the mortgagor shall be transferred to the Secretary when the housing is completed; and that the contract shall contain "such terms and conditions as the Secretary may determine to be necessary to protect the interests of the United States". All this demonstrates the reality and the integrity of the government's interest. See United States Fid. & Guar. Co. v. United States ex rel. Kenyon, 204 U.S. 349, 27 S.Ct. 381, 51 L.Ed. 516 (1907). Contrast the situation in Mudd v. Teague, 220 F.2d 162 (8 Cir. 1955). Furthermore, the furnishing of the bond is, under the statute, mandatory and is not permissive. These factors, it seems to us, qualify these payment bonds as ones "executed under any law of the United States", within the meaning of 28 U.S.C. § 1352, and the present suit as an action on such bonds.

We really have decided this issue before. Although the comment in Continental Cas. Co. v. United States for Use and Benefit of Robertson Lumber Co., 305 F.2d 794, 798 (8 Cir. 1962), cert. denied 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed. 2d 231, was by way of a footnote, and is characterized by the defense here as dictum, this court clearly recognized in that opinion the efficacy and the applicability of § 1352 when it said,

"A Capehart bond is clearly a bond required by a 'law of the United States,' hence, federal jurisdiction of a suit on such a bond is established without regard to any relationship between the Miller Act and the Capehart Act."

And in the very recent case of D & L Constr. Co. v. Triangle Elec. Supply Co., 332 F.2d 1009, 1011–1012 (8 Cir. 1964), another panel of this court twice referred to a Capehart bond as one "required by federal law". Other Capehart cases to the same effect are National State Bank of Newark v. Terminal Constr. Corp., 217 F.Supp. 341, 349 (D.N.J.1963), aff'd on the district court's opinion, 328 F.2d 315 (3 Cir.); United States for Use and Benefit of Miles Lumber Co. v. Harrison &

Grimshaw Constr. Co., 305 F.2d 363, 366 (10 Cir. 1962), cert. denied, 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229; Lasley v. United States for Use of Westerman, 285 F.2d 98, 100 (5 Cir. 1960); United States for Use and Benefit of Fine v. Travelers Indem. Co., 215 F.Supp. 455, 459 (W.D.Mo.1963); Northwest Lumber Sales, Inc. v. S. S. Silberblatt, Inc., 211 F.Supp. 749, 750 (E.D.Mo.1962); Autrey v. Williams & Dunlap, 210 F.Supp. 491, 497 (W.D.La.1962); Minneapolis-Honeywell Regulator Co. v. Terminal Constr. Corp., 41 N.J. 500, 197 A.2d 557, 563 (1964). Miller bond cases of like tenor are United States for Use and Benefit of Bryant Elec. Co. v. Aetna Cas. & Sur. Co., 297 F.2d 665, 669 (2 Cir. 1962), and United States for Use of West Pac. Sales Co. v. Harder Industrial Contractors, Inc., 225 F.Supp. 699, 702 (D.Or. 1963). See 1 Moore's Federal Practice, Par. 0.60 [8.-3], p. 626 (1961). See, also, Hartford Acc. & Indem. Co v. Baldwin, 262 F.2d 202, 203 (8 Cir. 1958) where this court said simply, in connection with a livestock dealer's bond required by regulations issued under the authority of the Packers and Stockyards Act, 7 U.S.C. § 204, "There was federal jurisdiction because the bond sued on was executed under the laws of the United States"; Adams v. Greeson, 300 F.2d 555, 557 (10 Cir. 1962), where the court, in connection with such a bond, relied on § 1352; and United States for Use and Benefit of Victory Elec. Corp. v. Maryland Cas. Co., 213 F.Supp. 800, 803, and 215 F.Supp. 700 (E.D.N.Y.1963), where the court mentioned the statute with respect to a bid bond given under the Armed Services Procurement Regulations authorized by the Miller Act.

The defense relies upon United States for Use of General Acc. Fire & Life Assur. Corp. v. Maguire Homes, Inc., 186 F.Supp. 659, 660 (D.Mass.1959). This is a comparatively early Capehart case. It seems to support the defense position. If so, we are not able to follow its reasoning and we do not understand its statement, 186 F.Supp. p. 660, that the Cape-

hart Act "contemplate(s) bonds in which the United States is the obligee". No other case in accord with Maguire has been cited to us.

We adhere to our footnote comment in Robertson and to our observations in Triangle and hold that § 1352 provides federal jurisdiction here. This makes it unnecessary for us to consider whether the Miller Act's jurisdictional provisions contained in 40 U.S.C. § 270b(b) also provide federal court jurisdiction for this Capehart bond action. Our inclinations as to this alternative, however, are revealed as we discuss the next point.

2. Jurisdiction over the persons of the individual defendants. Although service upon D & L and Continental was effected in Missouri, the individuals were served only at their California residences. It was conceded at pretrial that if the Miller Act is applicable on this aspect of the case, jurisdiction over these defendants was obtained by that service. See Limerick v. T. F. Scholes, Inc., 292 F.2d 195, 196 (10 Cir. 1961); United States for Use of Dillingham v. McCarty, 174 F.Supp. 629 (D.Colo.1959); United States v. Congress Constr. Co., 222 U.S. 199, 203–204, 32 S.Ct. 44, 56 L.Ed. 163 (1911); Rule 4(f), F.R.Civ.P.

The defense argument here is that the trial court was inconsistent when it said, first, "I must conclude that the court does not acquire jurisdiction under the Miller Act, and that any attempted service pursuant to the terms of that Act, would not be valid service on the individuals or members of a partnership outside the State of Missouri", and then, later, " * * * the service upon the nonresident defendants is valid, and * * * they are properly before this court"; that our Robertson case, supra, indicates the separateness of Capehart bond matters from those of Miller bonds; that either the Miller Act is applicable or it is not and, in the latter case, there is no jurisdiction over these California defendants; and that the trial court "had to have erred" in one or the other of its conclusions.

The Tenth Circuit, in United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Constr. Co., supra, at p. 369 of 305 F.2d, upheld a dismissal as to individual defendants served outside the state. Although not cited by the defense on this point, Harrison must be regarded as supporting the defense view here. The result may follow necessarily from the Tenth Circuit's conclusions, earlier in the same opinion, pp. 366–369 of 305 F.2d, that Capehart housing was not "public work" within the Miller Act, that "Congress did not intend that the Capehart Act performance and payment bonds, and suits thereon, should be governed by the Miller Act", and that "the Miller Act has no application to such a bond". The actual decision of the other and primary issue in that case, namely, that the notice provisions of the Capehart bond are governing, is identical with the result reached by us in Robertson, decided almost simultaneously, but a reading of the two opinions reveals that their reasoning to that end is by no means the same.

Judge Oliver, of the Western District of Missouri, however, has come to the opposite conclusion in a group of cases arising out of the construction activity at Fort Leonard Wood, and, in his thoughtful and provocative opinion in United States for Use and Benefit of Fine v. Travelers Indem. Co., supra, at pp. 460–465 of 215 F.Supp., has upheld out-state service upon non-residents in Capehart bond actions. He there said, with appealing logic, that, had he felt the questions were open for original decision by him, he would have determined that by the original 1955 Capehart Act, Congress recognized that the Miller Act would necessarily apply to contracts for Capehart housing; that the purpose of the 1956 amendment, with its reference to bonds, was to remove any possible doubt about it; and that all substantive provisions of the Miller Act and the Capehart Act were to be read into Capehart bonds. He observed that he was controlled by this court's decision in Robertson and by its rationale. He acknowledged that Robertson in certain respects was troublesome for him, and that this was particularly so when the majority opinion concluded with the statement, p. 800 of 305 F.2d, that "we think that the clear import of the language used was to take Capehart bonds entirely out of the Miller Act".

The only issue before this court in Robertson was whether the dual notice provisions of that Capehart bond, which were more stringent than those of the Miller Act, 40 U.S.C. § 270b(a), had to be met in order to bind the surety. We held that those notice provisions governed. In reaching this conclusion the majority opinion, p. 799 of 305 F.2d, reasoned that Congress, by the 1956 amendment intended to treat Capehart housing as sui generis "as far as bond protection for laborers and materialmen is concerned"; that, nevertheless, it also intended that Capehart suppliers "should have substantive bond protection essentially similar to that afforded Miller Act suppliers"; that "had Congress intended for the procedural provisions of the Miller Act to apply to Capehart contractors and their sureties it simply would have said so"; and that, because of the differences between Capehart housing and the more familiar types of government construction, "we do not know that absolute procedural uniformity is practicable, just, or desirable". It was in the wake of these observations that the exclusionary language was uttered.

We therefore do not regard the Robertson opinion as taking Capehart bonds "out of the Miller Act" in every respect and particularly so far as jurisdictional matters are concerned. The sentence which Judge Oliver found so troublesome must be read, as he intimated, in context and not out of it, and in the light of the issue and holding of that case. We sympathetically agree in general with Judge Oliver's analysis of Robertson when he observed, pp. 461–463 of 215 F.Supp., that we "did not hold that the Miller Act did not apply to a government military housing project contracted for under the authority of the Capehart

Act"; that we reasoned that "the Miller Act does apply, at least in some respects"; that the additional notice required by that bond "was procedural, as distinguished from jurisdictional", and was neither unreasonable nor oppressive; that the Miller Act is generally applicable to all government contracts of this type; that under Roberston there is "some sort of difference between the procedural requirements and the jurisdictional provisions of the Miller Act"; that, unlike Harrison, the Robertson case "can not be said to be a definite holding that the Miller Act does not in any way apply to the contracts for the construction of military housing as authorized by the Capehart Act"; that the "rationale of Robertson * * * requires us to hold that we are here dealing with substantive rights"; that the case intended only to pass on the dual notice question; and that this court did not intend its exclusionary language "as a blanket command". See, as to all this, D & L Constr. Co. v. Triangle Elec. Supply Co., supra, 332 F.2d 1009.

■ We do not desire by this opinion to introduce further complications into an already too complicated area by the development of technical niceties of distinction between procedural and jurisdictional and substantive aspects. Robertson stands for what it holds, namely, that the notice provisions of a Capehart bond prevail over the less stringent notice provisions in the Miller Act. We adhere to Robertson in this respect.

■ Having in mind the legislative history; the policy and the purpose behind the Miller and the Capehart Acts; the variances in state law; the common characteristics of these construction projects; the fact that participants who join in them often come from various parts of the country; the realization that there is a need for a practicable and yet a fair and reasonable means of assembling in one forum all the interested parties who were ready enough initially to devote their constructional abilities to a

project in the local area; the fact that the policy behind the Miller Act recognized and met that need; the added fact that the policy has equal application to Capehart construction; and the awareness that delay and expense otherwise to be incurred by multiple litigation in geographically separated forums will thereby be avoided, we conclude that the service in California on the defendants who did not reside in Missouri was a valid and effective service and that jurisdiction was thereby acquired over their persons. In this respect we agree with Judge Oliver's conclusions, p. 464 of 215 F.Supp., that Congress, by the Capehart Act, did not intend to effect a change in the methods of acquisition of jurisdiction of the person in an action based on one of these construction bonds, and

> " * * * that substantive federal rights are being asserted against the defendants named; that their capacity to sue and to be sued is within the exception stated in Rule 17(b) (1) of the Rules of Civil Procedure; that those defendants may therefore sue or be sued in their common names; and that service had in accordance with what would have been valid service had the actions been brought on a Miller Act bond will be ruled to be valid service in these actions on bonds issued in connection with government housing projects constructed pursuant to the authority granted by the Capehart Act."

Judge Oliver's analysis and struggle with the practicalities of the question and with the implications of Robertson, while difficult, have not been in vain. They have been helpful in their spotlighting and development of the problems with which we are all concerned.

■ If strict logic perforce demands a conclusion that this decision is but another way of saying that § 270b(b) of the Miller Act has application to a Capehart bond suit, we may be understood as

going that far in our present holding.[3] This result is reached, we feel, without impinging in any way upon the authority of Robertson.

3. The sufficiency of the notice. As has already been observed, Robertson demands compliance with the notice provisions of a Capehart bond and does not permit the supplier to stand on the more liberal notice provisions of the Miller Act.

Each payment bond here provides that D & L and the surety are obligated to a claimant, such as Allsop, in certain respects and that suit may be instituted on the bond under specified conditions. See footnote 2. It is at once apparent from these footnote quotations that the Capehart bond language closely follows and was evidently taken from that portion of the Miller Act which is now 40 U.S.C. § 270b(a). This court so noted in Triangle Elec. Supply, supra.

Allsop prepared a "Notice of intention to file mechanic's lien" directed to D & L, to the bonds' builder obligees, and to the non-individual components of the joint venture, and reciting that $93,088.-84 (the amount set forth in a statement of account theretofore submitted in writing to D & L and to Continental) was due and owing to Allsop for materials furnished, and that, unless satisfaction was received within ten days, "a statement of mechanic's lien" on the real estate would be filed. This was served by the sheriff on February 28, 1961, on the parties to whom the notice was directed. It was sent to Continental by registered mail on the same date and was received by it on March 1.

█ The Missouri statutes relating to materialmen's liens are contained in V.A. M.S., Ch. 429. Section 429.010 estab-lishes the lien. Section 429.080 provides that "a just and true account of the demand due" and "which is to be a lien" shall be filed with the clerk of the circuit court of the proper county, on the facts here, "within four months, after the indebtedness shall have accrued". Section 429.100 provides that a claimant other than the original contractor "shall give ten days' notice before the filing of the lien * * * to the owner, owners or agent, or either of them", and that such notice "may be served by any officer authorized by law to serve process in civil actions * * *". It has been said that although these lien statutes are remedial and are to be construed liberally, a claimant must nevertheless reasonably and substantially comply with them, and that service of the preliminary notice is a condition precedent to the right to sue to enforce the lien. Hertel Elec. Co. v. Gabriel, 292 S.W.2d 95, 101–102 (Mo.App.1956).

█ It is apparent from these statutes that a subcontractor, such as Allsop, is to give ten days' preliminary notice before the filing of its lien; that the account comprising the lien is to be filed with the court clerk; and that the filing must be effected within four months "after the indebtedness shall have accrued".

It is similarly apparent from the bonds that the notice period thereunder is an alternative one, namely, either ninety days after the date the last materials were furnished, or the time specified by the Missouri statutes "for the giving of first notice of a lien", whichever period is the longer; that written notice is to be given before the expiration of the period; that the notice is to be served by registered mail or in a manner by which

<hr>

3. We say this despite the implications to the contrary in Ireland's Lumber Yard v. Progressive Contractors, Inc., 122 N.W.2d 554, 556–561 (N.D.1963); Allsop Lumber Co. v. Continental Cas. Co., 73 N.M. 64, 385 P.2d 625, 628–629 (1963); and Minneapolis-Honeywell Regulator Co. v. Terminal Constr. Corp., supra, 41 N.J. 500, 197 A.2d 557 (1964), where state court jurisdiction of Capehart bond actions is upheld. Contrast this result with that reached in Travis Equipment Co. v. D & L Constr. Co. & Associates, 224 F.Supp. 410, 417–418 (W.D.Mo. 1963), and with the implications of the earlier New Jersey case of Gypsum Contractors, Inc. v. American Sur. Co., 37 N. J. 315, 181 A.2d 174 (1962).

process may be served locally; and that either the giving of notice or the filing of lien is sufficient.

The district court held that there was effective service of notice by March 1, 1961, when D & L had been served by the sheriff with the notice of intention and when Continental had received it by registered mail. It further held that, inasmuch as the "earliest date put forward by the defendant is November 10, 1960", when "the last shipment of material was placed in the hands of the carrier by the plaintiff", the time requirement was clearly satisfied for March 1 was within four months of November 10.

The defense asserts that the notice requirements were satisfied neither as to form nor as to timeliness; that under the state statutes the giving of a notice of "intention to file" a lien and the actual filing of that lien are two entirely separate steps which differ in their purpose, required content, and time due; that the trial court erred because it failed to distinguish between the two; that the notice was not the lien; that the bond's recital as to the alternative time period is directed to the "giving of first notice of a lien" and not to the filing of the lien; that this period is one ending, not four months after the indebtedness shall have accrued, but no later than at least ten days prior to the expiration of that four month period; that any notice of intention to file a materialmen's lien could not, on the facts here, be effectively served later than February 27, 1961; that, in any event, the four month period, if it is applicable, begins "after the indebtedness shall have accrued"; and that, under Missouri law, this occurred separately for each order as it was placed and did not relate back to indebtedness invoiced prior to the four month period.

■ We agree with the district court and hold that the notice conditions of the bond were satisfied. Certainly the bond contemplated the Missouri lien law time period as an alternative. It speaks in terms of the "first notice of a lien". This was effected in a concededly authorized manner by March 1, 1961, a date within four months of the preceding November 10. We are not persuaded by the argument that, for purposes of the Capehart bond, as distinguished from purposes of perfecting the local lien, the four month period of § 429.080 is converted into something less than four months because of the ten day notice provision of § 429.-100.

■ The point is that D & L and Continental had the prescribed written notice within four months from November 10. Notice and not the technical effectuation of the lien is what must have been contemplated by the language of the bonds. The very fact that the bonds provide that "either the giving of notice, or the filing of lien, in accordance with" local lien law "is a sufficient notice hereunder" lends conviction to this conclusion.

■ We do not go along with the additional defense argument that each shipment of lumber by Allsop was a separate transaction and that the notice period is therefore applicable to each separate shipment rather than to the subcontract as a whole. The one case urged by the defense in support of this proposition is Davidson v. Fisher, 258 S.W.2d 297, 304 (Mo.App.1953). That case, however, went off on a conclusion that "each transaction was a separate and distinct sale and was to be paid for in cash" and that there was no "one continuing contract or sale". The D & L-Allsop relationship is obviously different. Here there was a written and continuing contract for "all material" which "may be required for the complete and prompt performance" of the work. Under these circumstances the date of the last item delivered for the project is the date which is pertinent by Missouri law for lien purposes. This case is governed, we feel, by Badger Lumber Co. v. W. F. Lyons Ice & Power Co., 174 Mo.App. 414, 160 S.W. 49, 52 (1913), and Tull v. Fletcher, 196 Mo.App. 573, 196 S.W. 436, 439 (1917), rather than by Davidson v. Fisher.

4. Failure of proof. The defense argues that Allsop must show actual incorporation of the lumber supplied and its reasonable value, as distinguished from contract price, and that it failed to sustain this burden in either respect. This is the usual Missouri rule applicable to materialmen's liens when there is no contractual relationship between the claimant and the owner. Mississippi Woodworking Co. v. Maher, 273 S.W.2d 753, 755 (Mo.App.1954); Davidson v. Fisher, supra, pp. 301–302 of 258 S.W.2d.

The record does indicate that Allsop had no actual knowledge that all the lumber it furnished went into the project, that it "believed" some lumber was furnished by others, and that some remained unused. (A D & L vice-president testified, however, that the surplus was sold and Allsop was not asked to pick it up). Despite all this the district court held that the application of the above rule here would impose an "impossible" burden upon the plaintiff. It noted that the lumber was shipped by rail, unloaded by D & L and placed in a single storage area; that the subcontract made no mention of two separate projects; that this was an action on performance bonds and not one in quantum meruit; that the subcontract is detailed and was negotiated at arm's length; that it sets forth the agreed price; and that the amount due is to be determined by it.

Here again we agree with the result reached by the trial court. We observe preliminarily that each bond refers repeatedly to "material furnished". It also refers to suit under the bond "for such sum or sums as may be justly due claimant". This language appears to emphasize the furnishing of materials to the project, rather than their incorporation in it, and the amount contractually due, rather than the reasonable value of the goods furnished. Furthermore, in Robertson, supra, p. 799 of 305 F.2d, we observed that " * * * we think that Congress intended that Capehart suppliers should have substantive bond protection essentially similar to that afforded Miller Act suppliers * * * ".

It is now settled that any local lien rule requiring proof of actual incorporation into the project is not applicable to a suit on a Miller bond. All that is necessary is that the supplier in good faith reasonably believe that the materials are intended for the project. United States for Use and Benefit of Westinghouse Elec. Supply Co. v. Endebrock-White Co., 275 F.2d 57, 60, 79 A.L.R.2d 836 (4 Cir. 1960); United States for Use of Ascher Corp. v. Bradley-Dodson Co., 281 F.2d 676, 678 (8 Cir. 1960); Fourt v. United States for Use of Westinghouse Elec. Supply Co., 235 F.2d 433, 435 (10 Cir. 1956); Boyd Callan, Inc. v. United States for Use of Steves Industries, Inc., 328 F.2d 505, 511 (5 Cir. 1964); 79 A.L.R.2d 843, 846, and cases cited.

Under the Miller Act it also appears that quantum meruit is usually not the proper approach where there is an express and effective contract. The defense here appears to concede this for it would distinguish Miller Act cases because that statute, 40 U.S.C. § 270b(a), grants the right to sue on a Miller bond "for the amount, or the balance thereof, unpaid". It has been said that the Miller Act does not substitute or furnish a cause of action on a quantum meruit in derogation of the provisions of an express contract. Jefferson Constr. Co. v. United States for Use and Benefit of Bacon, 283 F.2d 265, 267 (1 Cir. 1960), cert. denied 365 U.S. 835, 81 S.Ct. 748, 5 L. Ed.2d 744; United States for Use and Benefit of Larkin v. Platt Contracting Co., 306 F.2d 724, 725 (1 Cir. 1962), cert. denied 371 U.S. 924, 83 S.Ct. 293, 9 L.Ed.2d 232. See City of St. Louis ex rel. Sears v. Southern Sur. Co., 333 Mo. 180, 62 S.W.2d 432, 435–436 (1933); United States for Use of Westinghouse Elec. Supply Co. v. Ahearn, 231 F.2d 353, 356 (9 Cir. 1955); and United States for Use and Benefit of Fine v. Travelers Indem. Co., supra, p. 474 of 215 F.Supp. The situation may be otherwise, of course, where there is no express contract or where work apart from the contract is done or where the agreement has been

rescinded or terminated. See Premier Roof Co. v. United States for Use and Benefit of Alpaca Elec. Corp., 315 F.2d 18, 21 (9 Cir. 1963); Sam Macri & Sons, Inc. v. United States for Use of Oaks Constr. Co., 313 F.2d 119, 125 (9 Cir. 1963); United States for Use and Benefit of Irvine v. Traylor Bros., 245 F.2d 678 (7 Cir. 1957).

■■■■■ With these results under the Miller Act so clear, our comments in Robertson, which were noted again in D & L Constr. Co. v. Triangle Elec. Supply Co., supra, that Capehart suppliers should have similar substantive bond protection require the conclusions that Allsop was not required to prove the actual incorporation of all the lumber it furnished and that the contract provisions are pertinent evidence and thus relieve Allsop of the burden of showing the reasonable value of the materials it furnished.

5. The shakes. The January 1960 contract between the parties specified the price of shakes per square to be used as siding for the houses and further stated that the shakes were to be "2 cartons per sq. laid 8″ to weather". Allsop later became aware of what it regarded as an error in this language in that the exposure should be 14 rather than 8 inches. This would result in fewer shakes being supplied for the price stated. Allsop wrote to D & L and pointed out this difference. D & L made no objection at that time. Allsop thereafter made shipments of shakes. The invoices for some of these stated "squares to be 14″ exposure". Only on February 28, 1961, when the notice of intention to file the materialman's lien was served did D & L demand delivery of enough shakes to be applied with only 8 inch weathering.

The trial judge decided this issue in Allsop's favor and did so because "It would seem from the actions of the parties that all matters concerning the shakes had been settled" and "it is clear from their acts that the parties had agreed that the figure eight was a clerical error". The defense asserts that this find-

ing was clearly erroneous; that Allsop undertook to change the contract unilaterally; that all errors in the agreement had been detected by the parties prior to its execution and had been corrected at that time by joint initialling; and that there is nothing in the record to show a mistake of fact on D & L's part.

■■■■■ The findings of the trial court are presumptively correct. Allsop was the prevailing party and we take that view of the evidence most favorable to it. It is entitled to the benefit of all favorable inferences which reasonably may be drawn from the facts proved. Wilson v. New York Life Ins. Co., 250 F.2d 649, 651 (8 Cir. 1958); Minnesota Amusement Co. v. Larkin, 299 F.2d 142, 146 (8 Cir. 1962). On these standards we cannot conclude that the district court's determination was clearly erroneous. Sufficient support for it is found in Allsop's giving notice of the claimed error to D & L; in the absence of written objection or even response, despite intervening correspondence, by the defendant to Allsop's assertion of error or to the exposure descriptions on certain of the invoices until the controversy came to an actual head; in the contrasting presence of an objection by D & L as to the length of the shakes; in the defendant's use of the shakes; and in its affixing them at an 11 or 12 inch exposure.

6. Truss material. D & L claims that it is entitled to reimbursement for its cost incurred in the handling and disposing of allegedly defective truss material. Allsop furnished this portion of the lumber pursuant to D & L's general instructions and shipped it to the jobsite. D & L unloaded it there, placed it in the stockpile, paid approximately $150,000 for it, and fashioned from it some 900 trusses for the houses. D & L obtained approval as to these from the Corps of Engineers serving as the inspecting agency in the field. Over 600 of the trusses already had been installed when the contracting officer finally rejected the use of the material as trusses. None of the material was returned.

The subcontract provided for Allsop's furnishing of materials "As Per Attached Exhibits A and B". It also provided that all materials shall be furnished "to the satisfaction of the Contractor, the Department, and the FHA or their authorized inspectors" and, further, that "Except as otherwise provided herein, all material * * * shall be subjected to inspection, examination and testing by the contracting officer * * *. The Department and the Contractor, or either of them, shall have the right to reject defective material * * *. [R]ejected material shall be satisfactorily replaced with proper material, without charge therefor * * *". Exhibit A, attached to the agreement and in the nature of specifications, referred to Exhibit B for applicable grades of lumber and prices. Exhibit B described truss material by size, variety of wood, and price.

As to this issue the district court ruled "The contractor accepted this material and made trusses from it after the Corps of Engineers had approved it. However, the trusses as constructed were rejected by the Corps on a higher level. In this situation the plaintiff cannot be charged with the costs incurred by the contractor".

The situation presented is one where, although not ordered by D & L as truss material, the lumber was released by Allsop as such but without control by it as to eventual use; where D & L accepted the material, obtained field approval for it, and proceeded to consume it by fashioning trusses out of it; where it went so far as to install over two-thirds of the trusses; and where it made no objection to the material and no offer to return it. Under all these circumstances we feel that the risk of field inspection approval of the lumber being upset by higher authority as to the trusses is that of the contractor and not that of the supplier. We are particularly aided in this conclusion by the facts that a large amount of lumber was consumed; that material approval by the contracting officer himself could have been sought prior to the fashioning of the trusses; and

that D & L's claim is restricted to the cost of handling and disposing and does not include the net cost of substitute material. We agree with the trial court that "in this situation" Allsop is not to be charged with the costs incurred.

7. Backpriming. In issue here is the cost to D & L for backpriming siding supplied by Allsop. The same Exhibit A attached to the contract between the parties provided that

"The prices quoted per M include all applicable taxes, except use tax if levied, precision pre-cutting, backpriming, treating, etc., as specified in Exhibit B, to deliver F.O.B. project (Fort Leonard Wood siding) the various lumbers in strict accordance with the contractor's schedule and instructions."

Exhibit B set forth kinds of stock, including siding, sizes and prices.

The district court held that this quoted portion of the contract clearly specified that prices included backpriming and that D & L was entitled to reimbursement for this cost when Allsop failed to backprime the siding material.

Allsop argues otherwise. It claims that whether particular lumber was to be backprimed depended on the contents of Exhibit B to which Exhibit A made reference; that Exhibit B said nothing as to backpriming siding; that, in contrast, it did refer to priming of wood shakes; and that, therefore, on the face of the contract, the parties did not specify that the siding was to be backprimed.

We cannot say that the district court erred on this issue. The quoted provision from Exhibit A is clear and specific. We regard Exhibit B's reference to priming as one inserted to distinguish primed wood shakes from the more expensive pre-finished ones as two classes of shakes commanding different prices. The fact that there is no other mention of priming in Exhibit B would, on Allsop's theory, leave Exhibit A's reference to priming without any significance except for the one class of available wood shakes. The trial court's con-

struction of the contract is not an offensive one and we affirm on this issue.

8. Prejudgment interest. By its amended complaint Allsop asked for 6% interest from December 6, 1960. It now claims interest from January 10, 1961. The trial court did not specifically deny the interest claim; it did, however, omit mention of the issue in its memorandum and the judgment which it entered allowed 6% interest only from the date of that judgment.

The same Exhibit A of the contract between the parties provides:

"Contractor will pay for all approved material bills for material received and invoiced up to the 20th day of preceding month after deducting all freight charges, 2% allowed discount and any demurrage and damage charge. Any period for determining allowance of discount shall commence when material is received or invoice received whichever is later. * * *

"If payment is not made within thirty days after payment is due in accordance with the terms of general contract, then interest at maximum rate of 6% per annum may be charged. * * * "

Both sides argue that Missouri law controls and that V.A.M.S. § 408.020 is the pertinent statute. They differ as to its application to the facts.

Prejudgment interest was one of the two items in controversy in our other recent Missouri Capehart bond case, D & L Constr. Co. v. Triangle Elec. Supply Co., supra, 332 F.2d 1009. The bond there, just as the ones here, authorized recovery for the sum "justly due" the claimant. There, as here, it was the supplier's invoices for the deliveries made to the contractor which stated that interest would be charged. The trial court's determination in that case, pp. 913–914 of 217 F.Supp., that the invoice provision

constituted a part of the contract between the subcontractor and the supplier, was not challenged on appeal. This court then held that, although it is necessary, where there is no express contract for interest, to look at state law to measure the extent of the obligation, this is not so where interest is covered by express contract. We concluded that there was an agreement there to pay interest on past due invoices; that such interest was a sum "justly due"; and that the defendants were liable for it under their Capehart bond.

█ Although this court in Triangle did "limit our holding to the facts", we feel that the ruling there is controlling here. The last of the two paragraphs quoted from Exhibit A certainly authorizes the charging of interest. Allsop's invoices flatly state that interest will be charged 90 days after arrival of the goods. No objection to this provision was made by D & L as the shipments and the invoices were received. Exhibit A and the invoices are part of the contract. We therefore need not look to state law as we would have to do if the contract between the parties were silent as to interest. We conclude that the district court judgment should have made provision for prejudgment interest.

We detect on this record and in the briefs no objection by D & L as to the propriety of January 10, 1961, as the appropriate date from which interest is to run, if any at all is owing, and we accept that date as the proper one.

The judgment of the district court is therefore affirmed in all respects except that the case is remanded with directions to amplify the judgment to include interest from and after January 10, 1961. So far as costs under our Rule 17(a) are concerned, Allsop shall be regarded as the prevailing party here; its costs with respect to the printing of the supplemental record in this court, however, are denied.